# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville October 15, 2013

## STATE OF TENNESSEE v. CHARLES MARTIN, JR.

**Appeal from the Circuit Court for Marion County**
**No. 8922    Buddy D. Perry, Judge**

---

**No. M2013-00867-CCA-R3-CD - Filed December 23, 2013**

---

The Defendant, Charles Martin, Jr., pled guilty to one count of kidnapping, as a Range II, multiple offender, with an agreed upon eight-year sentence. The trial court determined the manner of service, and the Defendant was placed in the Community Corrections Program and ordered to serve 180 days in confinement. A violation warrant was filed. Thereafter, the trial court revoked the sentence and ordered the Defendant to serve the balance of his sentence in confinement based upon the Defendant's commission of new crimes and his consumption of alcohol while at a local grocery store. The Defendant appeals the order of total incarceration. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

M. Keith Davis, Dunlap, Tennessee, for appellant, Charles Martin, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; J. Michael Taylor, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

On October 4, 2010, a Marion County grand jury returned a multi-count indictment against the Defendant, charging him with two counts of aggravated kidnapping and two

counts of aggravated assault for crimes against two different victims. The presentence report[1] provides the following facts underlying these offenses:

> Mr. Mich[ae]l Pittman states that he and Trevor Shoemake were in the Foodland parking lot when a large black male flagged them down and asked for a ride to Jasper and then just got into the truck. B/M told them [he] would give them an ounce of weed for the ride. Mr. Pittman told the B/M [that] they don't smoke wee[d,] and the B/M [the Defendant] pulled out a gun and showed it. They took [the Defendant] to the Jaycee Towers[,] and Mr. Pittman states that when the B/M got out of the truck he told them to not say a word, and then tapped the gun on the rear window . . . of the truck.

The Defendant pled guilty to one count of the lesser-included offense of kidnapping, a Class C felony, and the remaining charges were dismissed. See Tenn. Code Ann. § 39-13-303. Pursuant to terms of the plea agreement, the Defendant received an eight-year sentence, as a Range II, multiple offender, and the trial court was to determine the manner of service of the sentence.

At the sentencing hearing which followed, the trial court reviewed the presentence report. It was noted in the presentence report that the forty-year-old Defendant suffered from "paranoid schizophrenia[.]" Additionally, while on bond for these offenses, the Defendant was arrested for misdemeanor theft and attempt to distribute cocaine; he ultimately pled guilty to theft and received probation.

After hearing arguments from counsel, the trial court made the following observations in rendering its sentencing decision:

> I think we do have a person with -- with some mental problems. I'm concerned that things are escalating up, that's got to be a concern. I'm not sure at this point that the penitentiary works for this defendant or for the people of the State either. It costs a whole bunch of money to keep people in the penitentiary. . . .
> . . . I've got accomplish two things here. I've some way got to get his attention that we're not going to allow this to happen to anyone else. We're going to -- that's just got to stop. I mean it cannot happen to anyone else. So there's got to be some reasonable amount of jail time that accomplishes that purpose. He's drawing a disability check and I can't see how it would benefit anyone for me to put him in jail, that terminates the disability check.

---

[1] A transcript of the guilty plea hearing is not included in the appellate record.

The trial court then ordered the Defendant to serve 180 days in jail, which was to be served in fifteen-day increments beginning on the first day of each month for a period of twelve months. During periods of release and following his service of 180 days, the Defendant was to be placed in the Community Corrections Program. Additionally, while released in the first eighteen months of his sentence, the Defendant was on "absolute house arrest[.]" The trial court noted that it was taking the Defendant's "mental situation" into account in allowing the Defendant to be released and instructed him to continue with his mental health care appointments and recommendations.

The trial court warned the Defendant, "But if he doesn't strictly follow those requirements then I'm sorry, but at that point I've got to execute the sentence[,]" and further explained "absolute house arrest" as, "If he decides he wants to walk to the corner market to get a coke and he gets caught doing it, he's going to the penitentiary." The trial court continued, "But if you leave that house without this probation officer knowing you're leaving the house, then you're going to be violating the terms of this order." The Defendant was also not to have contact with the victims.

On February 27, 2012, a violation of community corrections warrant was filed against the Defendant, alleging that he had engaged in new criminal activity—false imprisonment, resisting arrest, and public intoxication. On April 24, 2012, an addendum to the warrant was filed, alleging that he amassed two new criminal charges for aggravated assault.

At the revocation hearing, South Pittsburg Police Officer Justin Graham testified regarding several of the new charges against the Defendant. Officer Graham stated that, on December 21, 2011, he responded to a disturbance call at the home of Deborah Reeves. Upon his arrival, he observed that Ms. Reeves was "shaken up" and crying. He had to get her to calm down first before she could convey what had happened. Ms. Reeves said that the Defendant had knocked on her door, that her daughter answered the door, and that the Defendant "barged in[.]" According to Ms. Reeves, the Defendant began "intimidating" her and ordered her to go to the store to buy him a beer. He then grabbed her by the arm and started "pull[ing] her out the door" in an effort to force her to go to the store. She testified that she was afraid to resist him but that she finally started to yell out. As she yelled, her son came outside, and the Defendant let her go. Ms. Reeves identified the Defendant as her assailant according to Officer Graham.

Following his interview with Ms. Reeves, Officer Graham proceeded to Harold's grocery store, where he encountered the Defendant who was exiting through the back door. Officer Graham pursued him. The Defendant was moving "swiftly across the back lot" headed towards an apartment complex, and Officer Graham very loudly commanded him to

stop several times. When the Defendant continued to walk away, Officer Graham drew his taser and informed the Defendant to stop or be tasered. The Defendant stopped.

The Defendant told Officer Graham that he did not know Officer Graham was trying to apprehend him. Officer Graham smelled alcohol on the Defendant, and the Defendant stated that he had been drinking. The grocery store was approximately four or five blocks away from the Defendant's residence according to Officer Graham. After speaking with the Defendant for a few minutes, Officer Graham took the Defendant into custody.

On cross-examination, Officer Graham confirmed that Ms. Reeves was not injured by the Defendant and that the Defendant was not armed at the time of the attack upon Ms. Reeves. When asked about how Ms. Reeves knew the Defendant, Officer Graham stated that initially "she acted like she didn't know who he was[,]" but that she then "told [Officer Graham] that [her assailant] went by . . . Skinny or Skinum," and that she knew the Defendant by the nickname "Skinum B[.]"

On re-direct examination, Officer Graham stated that he observed the Defendant "out a lot" in the neighborhood in the weeks prior to this incident, usually in the area of Harold's grocery store. Officer Graham did not know that the Defendant was on house arrest at that time.

Brent Basham testified that he was a community corrections officer, but he never personally supervised the Defendant. Mr. Basham stated that the judgment in this case was entered on April 26, 2011, and as a part of the Defendant's sentence, he was ordered to serve approximately six months in jail. The assaultive conduct referred to in the addendum to the warrant occurred during his incarceration. There was a videotape entered into evidence showing the Defendant striking another inmate on March 10, 2012.[2] Mr. Basham stated that the basis for seeking revocation of the Defendant's sentence was strictly the new criminal charges; he was up-to-date on his fines.

The Defendant called Dr. David A. Solovey, a clinical psychologist, to testify on his behalf. Dr. Solovey testified that he reviewed the Defendant's mental health records, that the Defendant presented with a "crossover diagnostic indicator for schizophrenia and affective disorders[,]" and that he had been hospitalized over fifty times as a result. The Defendant's "primary diagnosis" was "schizophrenia paranoid type[.]" A person afflicted with this mental health condition might suffer from "[d]elusions, hallucinations, ideas of reference, inappropriate affect, confusion, disorganized behavior overlaid with constant emotional arousal and discomfort." A "combination of mediation and organized ongoing

_____

[2] None of the exhibits to the revocation hearing, including the videotape, are a part of the record on appeal.

involvement with treatment facilities" should be used to treat someone diagnosed with schizophrenia according to Dr. Solovey.

Dr. Solovey noted that it was common for persons with this mental health condition to "self-medicate" and that this was particularly true in the Defendant's case. According to Dr. Solovey, the Defendant drank to cope with the depression, agitation, and anxiety when those conditions were not properly addressed. Dr. Solovey further stated that the use of alcohol may cause some symptoms to subside but that it can also lead to other symptoms.

Dr. Solovey stated that the Defendant's mental health issues began to surface in 1998. The first event to trigger the Defendant's psychotic disorder occurred when the Defendant and another person "were pushing a vehicle and then it got hit by a car and a lady was killed[.]" While the Defendant's condition was already present, it was not triggered until this traumatic event occurred according to Dr. Solovey. Dr. Solovey reviewed the Defendant's criminal history and stated that the Defendant's "more significant problems" began around 2008 when the Defendant's father died. At that time, the Defendant's arrests for intoxication became "consistent and frequent[.]" Dr. Solovey believed that the Defendant and his father were very close and that his father's supervision likely kept the Defendant "anchored" and "focused[.]"

Dr. Solovey testified that, due to the Defendant's mental health condition, he was "not able to really fully and adequately function due to his mental disorder[,]" and therefore, he received disability benefits from the Social Security Administration. Dr. Solovey described the Defendant as "childlike, dependent, and obsequious[,]" and due to these characteristics, the Defendant would be "a target" and victimized while in prison in Dr. Solovey's opinion. Dr. Solovey watched the video of the Defendant assaulting another inmate and perceived that the Defendant was asking the other inmate for something before the Defendant struck him. The Defendant informed Dr. Solovey that this inmate had taken the Defendant's medications from him, which were dispensed once a day and the Defendant "dosed himself accordingly[.]" When the inmate refused to return the Defendant's medications, the Defendant paused briefly and then attacked. According to Dr. Solovey, if a schizophrenic is not getting the proper medication, then that person would "tend to be agitated, frantic, and frighten, and just very unstable."

When asked about his recommendations for the Defendant's sentence in this case, Dr. Solovey stated that, in the past, someone like the Defendant would have been in a long term psychiatric facility, but such facilities were no longer a part of the correctional system in this state. Dr. Solovey described "community mental health centers" as an available option in Tennessee with caseworkers and "outreach programs[.]" According to Dr. Solovey, the Defendant needed a case worker for supervision, who could verify his attendance at

Alcoholics Anonymous meetings, ensure proper taking of his medications, and provide his family with assistance. He noted an "outreach house" in Jasper that offered services of this type; Dr. Solovey was not familiar with a program called "Strategies for Life[.]"

After performing his mental evaluation of the Defendant, Dr. Solovey did not believe the Defendant was capable of testifying on his own behalf at the revocation hearing. On cross-examination, Dr. Solovey clarified the Defendant's competency level, "It's on the edge of not competent, but still competent with coaching." Dr. Solovey did not believe that the Defendant previously had a caseworker or mental health worker during his release, being supervised only by a community corrections officer. When asked about his knowledge of how the jail dispensed its medication, Dr. Solovey stated that he obtained this information from the Defendant's attorney regarding the assault incident and how the medication was dispensed. Dr. Solovey confirmed that medications of the type taken by the Defendant would be adversely affected by alcohol and that the Defendant was an alcoholic. The Defendant also had a history of illegal drug usage.

The Defendant lived with his mother, and she was called to testify. She agreed that the Defendant's mental health issues surfaced in 1998 following the car accident. According to the Defendant's mother, the woman that was killed in that accident was a neighbor. She confirmed that, if the Defendant was released, she would be able to transport him to his mental health care appointments. She testified that, at the time of the hearing, she was managing the Defendant's money for him, and she had paid his court costs on his behalf. She would continue to manage his finances if he was released.

The Defendant had previously established an account at Harold's grocery store, and he had been given permission by his probation officer to go to the store to pay that bill according to his mother. On cross-examination, she testified that she had "some papers at home" giving the Defendant permission to visit his disabled uncle and to go to Harold's grocery store. He also was allowed to go to his doctor's appointments in Cleveland. She stated that she took the Defendant to appointments with his "parole officer" twice a week and that she talked with that officer periodically.

When asked if the Defendant ever smelled of alcohol upon returning to the house, his mother stated in the affirmative. According to his mother, this happened "[e]very now and then[.]" She did not believe he ever drank inside the house.

The Defendant's brother testified, stating that he was also willing to transport the Defendant to his necessary appointments if released. His brother described that the Defendant and his father were "extremely close" and stated that the accident "when the lady

was killed . . . messed [the Defendant] up." He also observed that the Defendant had been drinking at times during his release.

The trial court found that the Defendant violated the conditions of his community corrections sentence by "being present at [the] store [and] drinking alcohol"[3] and by engaging in "new criminal conduct."[4] In so concluding, the trial court noted the following:

> We've got a progression of behavior that is starting to result in physical assaults on other folks. How do I -- if you're about to argue to me I should send him some place other than the penitentiary, I would agree with you. I need that alternative. I don't have it. Can I put him back on the street where the next time someone gets really seriously hurt? . . .
> . . . [I]f I start weighing who should go to prison based upon my prediction of how they, how they fare in the prison system, well, if I start putting -- I've modified the sentencing act completely if I start doing that. . . .
> How does he defend the drinking when I put him on house arrest? I mean, I should have sent him to the penitentiary last time, and I didn't do it. I looked for every way to avoid doing that. Then everything I'm hearing is he just really didn't pay any attention to me on the house arrest. I mean, it was of no significance to him. He continues to drink and . . .
> If I didn't communicate that clearly to him last time what's to tell me that he's going to understand it? I mean, I'm just at a loss. I can't just say continually to folks would you just please do what we ask you to do. There's only so many times we can say please.

Accordingly, the court revoked the Defendant's community corrections sentence and ordered him to serve the balance of his sentence in confinement. The Defendant now appeals that decision.

## ANALYSIS

On appeal, the Defendant argues that the trial court abused its discretion when it revoked his community corrections sentence because the evidence was insufficient to

---

[3] Neither drinking alcohol nor violating the conditions of the Defendant's house arrest were included as grounds for revocation in the violation warrants.

[4] The trial court was not specific in its findings as to which of the criminal offenses it found the Defendant committed.

establish that he had engaged in new criminal conduct and that the decision to order total incarceration was inappropriate due to his mental illness. The State contends that the trial court properly revoked the Defendant's community corrections release and properly ordered him to serve his original sentence. We agree with the State.

Generally, community corrections sentences are governed by the Tennessee Community Corrections Act of 1985. See Tenn. Code Ann. § 40-36-101 to -306. The Act provides as follows:

> The court shall . . . possess the power to revoke the sentence imposed at any time due to the conduct of the defendant or the termination or modification of the program to which the defendant has been sentenced, and the court may resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration.

Tenn. Code Ann. § 40-36-106(e)(4). A trial court may revoke a community corrections sentence upon finding by a preponderance of the evidence that an offender violated the conditions of his suspended sentence. See Tenn. Code Ann. § 40-35-311(e), -36-106(e)(3)(B) ; see also State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). The trial court's revocation of a community corrections sentence will be upheld absent an abuse of discretion.[5] Harkins, 811 S.W.2d at 82. "Given the similar nature of a community corrections sentence and sentence of probation, the same principles are applicable in deciding whether a community corrections sentence revocation was proper." Id. at 83. An abuse of discretion occurs if the record contains no substantial evidence to support the conclusion of the trial court that a violation of community corrections has occurred. See id. at 82; State v. Gregory, 946 S.W.2d 829, 832 (Tenn. Crim. App. 1997). The credibility of witnesses is to be determined by the trial judge. State v. Mitchell, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991).

---

[5] The Defendant argues that this court reviews the decision of manner of service de novo; however, the standard of review in revocation proceedings has always been abuse of discretion. This was merely a revocation proceeding; no new sentence was imposed. Furthermore, to address the State's response to the Defendant's argument, we see no need to extend the principles outlined in State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012) (granting a presumption of reasonableness to "within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act"), to these revocation proceedings.

The Defendant argues that the evidence is insufficient to support revocation of his sentence based upon these new charges, noting that the State failed to present testimony from the victims of these new offenses. However, we disagree. In order to establish a violation of a suspended sentence based on the commission of a new offense, the State must offer proof by a preponderance of the evidence showing that a defendant violated the law. See State v. Catherin Vaughn, No. M2009-01166-CCA-R3-CD, 2010 WL 2432008, at *3 (Tenn. Crim. App. June 14, 2010) (noting that proof of a conviction is not necessary). In addition, the State "must present sufficient facts at the revocation hearing to enable the trial court to 'make a conscientious and intelligent judgment as to whether the conduct in question violated the law.'" State v. Jason L. Holley, No. M2003-01429-CCA-R3-CD, 2005 WL 2874659, at *4 (Tenn. Crim. App. Oct. 25, 2005) (quoting Harkins, 811 S.W.2d at 83 n.3).

Officer Graham testified that he responded to a disturbance call at Ms. Reeves's home on December 21, 2011, and found her visibly upset. After she regained her composure, Ms. Reeves told Officer Graham that the Defendant had "barged in" to her home and attempted to forcibly make her accompany him to the store to buy him beer. The Defendant only abandoned this endeavor when Ms. Reeves's son responded to her screams. We disagree with the Defendant's summation that these actions did not substantially interfere with Ms. Reeves's liberty. See Tenn. Code Ann. § 39-13-302 (false imprisonment). This court has previously concluded that a police officer's testimony about the facts surrounding the arrest used as the basis for the violation "constituted substantial evidence" and was "sufficient to support the trial court's [revocation of a suspended sentence]." State v. Chris Allen Dodson, M2005-01776-CCA-R3-CD, 2006 WL 1097497, at *3 (Tenn. Crim. App. Mar. 31, 2006). Officer Graham's testimony alone supports the trial court's decision to revoke the Defendant's community corrections sentence for his failure to comply with the laws of this State based upon his actions against Ms. Reeves inside her home.[6]

Regarding the assaultive offense while the Defendant was in jail, the Defendant argues that he was authorized to use force to retrieve his medications from the prisoner, citing Tennessee Code Annotated section 39-11-614 (protection of property). The Defendant states in his brief that he was subsequently acquitted of these charges. The disposition of a new charge does not determine the outcome of a revocation hearing: "[A] trial judge at a .

---

[6] The Defendant was also charged with resisting arrest and public intoxication as a result of his behavior on December 21, 2011, and those charges were included in the first violation warrant. The Defendant is correct that he did not use force against the officer a required element for commission of the offense of resisting arrest. See Tenn. Code Ann. § 39-16-602. He also argues that there was no evidence that he was intoxicated, there being no evidence of field sobriety tests performed or any other tests such as a blood test or breathalyzer conducted. Officer Graham testified that the Defendant smelled of alcohol and that the Defendant stated he had been drinking; however, Officer Graham never stated that the Defendant appeared intoxicated. See Tenn. Code Ann. § 39-17-310.

. . revocation hearing is not bound by an acquittal of a criminal offense which occurs . . . after a suspended sentence is granted when it appears that a defendant is guilty of conduct inconsistent with good citizenship." State v. Delp, 614 S.W.2d 395, 396-97 (Tenn. Crim. App. 1980) (citing Ray v. State, 576 S.W.2d 598, 600 (Tenn. Crim. App. 1978)). Accordingly, even if the Defendant had been acquitted of the new charge, the trial court retained the authority to revoke the Defendant's probation. See State v. Charles King Morris a/k/a Carl Adam Jackson, No. E2013-00230-CCA-R3-CD, 2013 WL 4047496, at *3 (Tenn. Crim. App. Aug. 12, 2013), perm. app. filed, (Tenn. Oct. 9, 2013).

Finally, the trial court did not abuse its discretion by ordering the Defendant to serve his sentence in custody. The Defendant argues that his mental illness should permit him another chance at an alternative sentence in a "community mental health center[]." The trial court considered the Defendant's mental illness in its original decision to grant the Defendant an alternative sentence and warned the Defendant at the sentencing hearing that, if he violated the conditions of his house arrest, the trial court would have no choice but to revoke his community corrections sentence. This court has repeatedly cautioned "'that an accused, already on [alternative sentencing], is not entitled to a second grant of probation or another form of alternative sentencing.'" State v. Benjamin William Riffey, No. E2011-00641-CCA-R3-CD, 2012 WL 762320, at *8 (Tenn. Crim. App. Mar. 9, 2012) (quoting State v. Jeffrey A. Warfield, No. 01C01-9711-CC-00504, 1999 WL 61065, at *2 (Tenn. Crim. App. Feb. 10, 1999)). Therefore, the trial court was authorized by statute to revoke the Defendant's community corrections sentence and impose the original term of confinement. See Tenn. Code Ann. §§ 40-35-311(e), -36-106(e). We conclude that the trial court did not abuse its discretion. See, e.g., State v. Brandi Nichole Miller, No. M2011-02025-CCA-R3-CD, 2012 WL 1939927, at *3 (Tenn. Crim. App. May 30, 2012) (revocation of probation affirmed for mentally-ill defendant where record showed defendant had already been twice revoked and returned to probation based on earlier violations, and yet still continued to commit criminal acts), perm. app. denied, (Tenn. Sept. 21, 2012).

CONCLUSION

In sum, we conclude that the trial court did not abuse its discretion by revoking the Defendant's community corrections sentence and by ordering him to serve the balance of his original sentence in confinement. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE